# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

## PUEBLO v HAAS

Docket No. 164046. Argued April 4, 2023 (Calendar No. 3). Decided July 24, 2023.

Carrie Pueblo brought an action against her former domestic partner, Rachel Haas, in the Kalamazoo Circuit Court under the Child Custody Act (CCA), MCL 722.21 *et seq*., seeking joint custody and parenting time for a child whom defendant conceived through in vitro fertilization and gave birth to in 2008, during the parties' relationship. Defendant moved for summary disposition under MCR 2.116(C)(5) and MCR 2.116(C)(8), asserting that because the parties had never married and plaintiff had no biological or adoptive relationship to the child, plaintiff lacked standing to sue and also failed to state a claim for which relief could be granted. Following a hearing, the trial court, Stephen D. Gorsalitz, J., granted the motion and dismissed the case without prejudice. After defendant moved for reconsideration, the trial court dismissed the action with prejudice. Plaintiff then filed her own motion for reconsideration, arguing that she had standing as a natural parent, despite the lack of genetic connection, following the Court of Appeals decision in *LeFever v Matthews*, 336 Mich App 651 (2021), which expanded the definition of "natural parent" to include unmarried women who gave birth as surrogates but shared no genetic connection with the children. Plaintiff also asserted that the trial court order violated her Fourteenth Amendment rights to due process and equal protection, as well as those of the child. Plaintiff further argued that any dismissal should have been without prejudice. The trial court denied reconsideration, distinguishing *LeFever* on the ground that plaintiff had not given birth to the child. Plaintiff appealed, reasserting her previous arguments and further asserting that the equitable-parent doctrine should extend to the parties' relationship, which had been solemnized in a civil commitment ceremony when it was not yet legal in Michigan for same-sex partners to marry. The Court of Appeals, GADOLA, P.J., and SWARTZLE and CAMERON, JJ., rejected these arguments and affirmed the trial court in an unpublished per curiam opinion of the Court of Appeals, issued December 28, 2021 (Docket No. 357577). The Supreme Court granted plaintiff's application for leave to appeal, asking whether and to what extent the equitable-parent doctrine should be extended to provide standing under the CCA to plaintiff and those similarly situated in light of *Obergefell v Hodges*, 576 US 644 (2015), which invalidated Michigan's prohibitions on same-sex marriage. 510 Mich 936 (2022).

In an opinion by Justice CAVANAGH, joined by Chief Justice CLEMENT and Justices BERNSTEIN, WELCH, and BOLDEN, the Supreme Court *held*:

A former member of a same-sex couple seeking custody of a child to whom they did not give birth and with whom they share no genetic connection is entitled to make their case for equitable parenthood and thus establish standing to bring an action under the CCA. To do so, the plaintiff must demonstrate by a preponderance of the evidence that the parties would have married before the child's conception or birth but for Michigan's unconstitutional marriage ban. When determining whether a plaintiff satisfies this standard, courts should consider the nondispositive factors set forth in *In re Madrone*, 271 Or App 116 (2015). The Court of Appeals judgment was reversed and the case remanded to the trial court to apply this threshold test. To the extent that *Lake v Putnam*, 316 Mich App 247 (2016), was inconsistent with the Court's opinion, it was overruled.

1. Under the equitable-parent doctrine, a spouse who is not a biological parent has standing to seek custody of a child born or conceived during their marriage when (1) the would-be equitable parent and the child acknowledge the parental relationship or the biological or adoptive parent has cultivated the development of a relationship over a period of time, (2) the would-be equitable parent desires to have the rights afforded a parent, and (3) the would-be equitable parent is willing to pay child support. Before 2015, Michigan unconstitutionally prohibited same-sex couples from marrying and refused to recognize legal marriages performed in other jurisdictions. Consequently, a same-sex partner did not have the option to adopt their spouse's child or to marry their pregnant partner and benefit from the marital presumption of parentage. Further, unmarried same-sex couples were not permitted to adopt through second-parent adoption. *Obergefell* rendered Michigan's unconstitutional bar on same-sex marriage unenforceable, holding that the denial of the ability to marry was a denial of same-sex couples' constitutional due-process and equal-protection rights. *Obergefell* noted generally the importance of the various benefits that the states have connected to marriage, referred to as the "constellation of benefits," and specifically emphasized the harm that the unconstitutional prohibition on marriage caused the children of same-sex couples. Recognition of equitable parenthood is one of the "constellation of benefits" associated with marriage in Michigan, and, as a matter of equity and constitutional law, Michigan courts are compelled to treat same-sex couples equally. Accordingly, *Obergefell* demanded the extension of the equitable-parent doctrine to those who were unable to marry during their same-sex relationships because of discriminatory and unconstitutional Michigan laws but who developed de facto parent-child relationships with the children born or adopted by their same-sex partners during the time they would have otherwise been married. This extension served the underlying rationale of the equitable-parent doctrine, which considers the best interests of the child to be paramount, and it was consistent with recent developments in the law recognizing that federal and state law protects people from discrimination on the basis of sexual orientation. It was not necessary to overrule *Van*, which involved parties who chose not to legally marry despite their ability to do so. However, it was necessary to overrule *Lake*, which had declined to extend the equitable-parent doctrine to same-sex couples who had previously been unable to marry, to the extent it was inconsistent with the Court's holding. *Lake*'s concern about retroactively and unilaterally creating a marriage relationship against the parties' wishes was remedied by requiring the person seeking custody to show, by a preponderance of the evidence, that the parties would have married had they been legally permitted to do so in Michigan. In light of the conclusion that plaintiff may pursue standing as an equitable parent, her alternative claims were not addressed.

2. A would-be equitable parent has standing if they demonstrate by the preponderance of the evidence that the parties would have married before the child's birth or conception but for the unconstitutional laws that prevented them from doing so. This approach is based on *Madrone*, which crafted a factual inquiry to be applied when extending the presumption of parentage in its artificial-insemination statute to same-sex partners of biological mothers. *Madrone* concluded that the proper focus was on whether the parties would have married but for the previous unconstitutional state prohibition on same-sex marriage, which involved a contemporaneous inquiry concerning the mutual intent of the parties. The relevant factors it concluded would support an inference that same-sex partners would have married but for the prior unconstitutional bar included whether the couple took advantage of other options giving legal recognition to their relationship, held each other out as or considered themselves to be spouses, had children during the relationship and shared childrearing responsibilities, held a commitment ceremony or otherwise exchanged vows of commitment, exchanged rings, shared a last name, commingled their assets and finances, made significant financial decisions together, sought to adopt any children either of them may have had before the relationship began, or attempted unsuccessfully to get married. The Supreme Court adopted this approach and held that in Michigan, if the intent to marry is disputed, a would-be equitable parent must prove by a preponderance of the evidence that the couple would have married based on their contemporaneous conduct, considering the illustrative but nondispositive and nonexhaustive factors set forth in *Madrone*. If that threshold test for standing is satisfied, the court may evaluate the equitable-parent factors to determine whether the would-be equitable parent has standing to seek custody and parenting time.

3. Plaintiff made a sufficient showing to survive summary disposition under MCR 2.116(C)(8) on standing grounds. In particular, plaintiff's allegations that she cultivated the development of a relationship with the child over a period of time, desires to have parental rights, and is willing to pay child support are sufficient to advance her claim for equitable parenthood. Plaintiff also alleged facts entitling her to a threshold determination of whether the parties would have married but for Michigan's unconstitutional bar on same-sex marriage.

Court of Appeals judgment reversed; case remanded to the trial court for further proceedings.

Justice BOLDEN, concurring, wrote separately to note that because many state laws relating to marriage, out-of-wedlock parenting, and reproductive technologies had been enacted without consideration of *Obergefell*, the Legislature should act to resolve the lingering puzzles that remained regarding how the current applicable statutory schemes could fit the practical realities of same-sex relationships with regard to parenting. In particular, she stated that, aside from the question whether the Legislature should address the equitable-parent doctrine, it should clarify ambiguities in the CCA, which says nothing about biology or marriage and contains an unclear definition of "natural parent." She echoed former Justice KELLY's observation in *Van* that, in custody disputes, the Legislature's overriding concern has not been the preservation of the institution of marriage, but rather the best interests of the children, and she suggested that the Legislature consider amending the CCA for consistency with this priority in mind. She also suggested that the Legislature consider whether to enact a formal procedure to address situations like plaintiff's. In sum, she urged the Legislature to answer the questions raised by this case

regarding children born to same-sex couples by enacting a sufficient statutory scheme that would adequately reflect equal-protection and due-process considerations.

Justice ZAHRA, joined by Justice VIVIANO, dissenting, disagreed with the extension of the equitable-parent doctrine. He questioned the validity of the doctrine, expressed concern that its legally unsupported extension would result in far-reaching ramifications outside the child custody context, and did not believe it was an appropriate tool to provide plaintiff the relief she sought. He also questioned the advisability of the "but for" test set forth by the majority and worried that it would be applied too broadly. Finally, he emphasized that plaintiff's remedy rested with the Legislature rather than the judiciary. For these reasons, he would have declined to disturb the lower courts' decisions.

# OPINION

Chief Justice:
    Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED  July 24, 2023

STATE OF MICHIGAN

SUPREME COURT

CARRIE PUEBLO,

       Plaintiff-Appellant,

v

No. 164046

RACHEL HAAS,

       Defendant-Appellee.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

In this case, we determine that the courthouse doors will open to a former partner in a same-sex relationship who was unconstitutionally prohibited from marrying before the decision in *Obergefell v Hodges*, 576 US 644; 135 S Ct 2584; 192 L Ed 2d 609 (2015), to seek custody of a child with whom the former partner shares no biological relationship.[1]

---

[1] In this context, a person who shares "no biological relationship" with a child is someone who neither birthed the child nor shares a genetic connection with the child by having contributed their reproductive material.

While the decision in this case likely affects few, it is, nonetheless, important for what it represents. Justice does not depend on family composition; all who petition for recognition of their parental rights are entitled to equal treatment under the law. "[B]iological relationships are not [the] exclusive determination of the existence of a family[.] . . . No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in [their] care may exist even in the absence of blood relationship." *Smith v Org of Foster Families for Equality & Reform*, 431 US 816, 843-844; 97 S Ct 2094; 53 L Ed 2d 14 (1977).

Michigan has long recognized the "equitable-parent doctrine" as providing standing to nonbiological fathers as parents when certain criteria are met. *Atkinson v Atkinson*, 160 Mich App 601; 408 NW2d 516 (1987). Because Michigan unconstitutionally prohibited same-sex couples from marrying before *Obergefell*, we narrowly extend the equitable-parent doctrine as a step toward righting the wrongs done by that unconstitutional prohibition. A person seeking custody who demonstrates by a preponderance of the evidence that the parties would have married before the child's conception or birth but for Michigan's unconstitutional marriage ban is entitled to make their case for equitable parenthood to seek custody. We reverse and remand to the trial court to apply the threshold test for standing that we announce today.

## I. FACTS AND PROCEDURAL BACKGROUND

Two women—plaintiff, Carrie Pueblo, and defendant, Rachel Haas—were in a long-term committed relationship, or domestic partnership, from the early 2000s until the early 2010s. During their relationship, the parties were unable to legally marry in

2

Michigan, which unconstitutionally prohibited same-sex marriage until 2015. See *Obergefell*, 576 US 644. In their briefs and at oral argument, the parties acknowledged that they participated in a private civil commitment ceremony in June 2007 that was presided over by a priest and involved the exchange of rings and vows to take one another as life partners. Later that year, they decided to use in vitro fertilization to bring a child into the world. Haas conceived and bore the child, JPHP, in November 2008, and shares the child's biology. Pueblo has no biological connection to JPHP, whose last name is a hyphenation of the parties' last names. The parties never married, nor was Haas married to another person at the time of JPHP's conception or birth. Haas is the only parent listed on the child's birth certificate. Pueblo alleges that both parties acted as parents to JPHP from birth, sharing custody and parenting time even after they separated in the early 2010s. However, Pueblo alleges that Haas demanded that she cease contact with JPHP beginning in 2017 and that Pueblo's efforts to continue the parent-child relationship were unsuccessful.

In 2020, Pueblo took a legal step toward reunification with JPHP by filing a custody complaint under the Child Custody Act (CCA), MCL 722.21 *et seq.*, seeking joint custody, parenting time, and child support. Haas countered in her answer that Pueblo lacked standing, that the parties never married, and that Pueblo has no biological or adoptive relationship to JPHP. Subsequently, Haas moved for summary disposition on the basis that Pueblo lacked standing under MCR 2.116(C)(5) and failed to state a claim under MCR 2.116(C)(8).

Following a hearing, the trial court granted the motion and dismissed the case without prejudice. Upon Haas's motion for reconsideration, the trial court dismissed the

3

action *with* prejudice. Pueblo then filed her own motion for reconsideration, arguing that she had standing as a natural parent despite the lack of genetic connection following the recent Court of Appeals decision in *LeFever v Matthews*, 336 Mich App 651; 971 NW2d 672 (2021). She also asserted that the trial court order violated her Fourteenth Amendment rights to due process and equal protection without surviving heightened scrutiny and that the minor child's rights were likewise violated. Pueblo further argued that, even if dismissal was warranted, the dismissal should have been without prejudice. The trial court denied reconsideration, rejecting Pueblo's arguments on both issues. As to the standing issue, the trial court distinguished *LeFever* because Pueblo neither birthed the child nor shares a biological or genetic connection.

Pueblo appealed in the Court of Appeals. Relevant to this appeal, Pueblo argued that she had standing to seek custody for several reasons. First, that the equitable-parent doctrine should extend to the parties' equitable marriage. Second, that she was a "natural parent" under the CCA and the interpretation of the term in the closely analogous *LeFever* case. Finally, that her rights to equal protection and due process, as well as the child's, were violated by the trial court's finding that a biological tie was necessary for standing. The Court of Appeals disagreed, holding that Pueblo was not a parent under the CCA and affirming the lower court's dismissal.[2] *Pueblo v Haas*, unpublished per curiam opinion of the Court of Appeals, issued December 28, 2021 (Docket No. 357577).

Pueblo then sought leave to appeal in this Court. We granted leave to address:

---

[2] The Court of Appeals declined to address Pueblo's argument that granting defendant's reconsideration motion was an abuse of discretion on the ground that Pueblo had abandoned the issue, and Pueblo does not resurrect that argument here.

4

(1) whether, in light of *Obergefell v Hodges*, 576 US 644 (2015), the equitable parent doctrine should be extended to provide standing to persons such as the plaintiff, who, at the time of the parties' same-sex relationship, was not permitted by Michigan law to legally marry the defendant, and if so, (2) what the parameters of that extension should be. [*Pueblo v Haas*, 510 Mich 936 (2022).]

## II. STANDARD OF REVIEW

This case presents questions of law that we review de novo. Questions of statutory interpretation and constitutional issues are reviewed de novo. *Hunter v Hunter*, 484 Mich 247, 257; 771 NW2d 694 (2009); *LeFever*, 336 Mich App at 661. Likewise, whether a party has standing to seek custody is reviewed de novo. *LeFever*, 336 Mich App at 661. A trial court's decision on a motion for summary disposition is reviewed de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). When deciding a motion under MCR 2.116(C)(8), a trial court must accept all factual allegations in the complaint as true and the motion may only be granted "when a claim is so clearly unenforceable that no factual development could possibly justify recovery."[3] *El-Khalil*, 504 Mich at 160. In child custody disputes, trial court orders and judgments are generally entitled to deference on appeal. See MCL 722.28. But reversal is required where the trial court made a "clear legal error on a major issue." *Id*. "When a court incorrectly chooses,

---

[3] Although Haas challenged Pueblo's standing under MCR 2.116(C)(5), like the Court of Appeals, we note that standing is more appropriately challenged under MCR 2.116(C)(8) or (C)(10) and that we may review the issue under the appropriate subrule regardless of which subrule the trial court relied on to grant summary disposition. *Pueblo*, unpub op at 2 n 2. See also *Mich Chiropractic Council v Comm'r of Office of Fin & Ins Servs*, 475 Mich 363, 374 n 25; 716 NW2d 561 (2006), overruled on other grounds by *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349 (2010); *Le Gassick v Univ of Mich Regents*, 330 Mich App 487, 496 n 2; 948 NW2d 452 (2019).

interprets, or applies the law, it commits legal error that the appellate court is bound to correct." *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994).

## III. LEGAL BACKGROUND

We are asked to determine whether Pueblo has standing to pursue this custody action. Standing "generally refers to the right of a plaintiff initially to invoke the power of a trial court to adjudicate a claimed injury." *Saugatuck Dunes Coastal Alliance v Saugatuck Twp*, 509 Mich 561, 583; 983 NW2d 798 (2022) (quotation marks and citation omitted). The purpose of the doctrine is to ensure that a party's interest in the issue is "sufficient to 'ensure sincere and vigorous advocacy.' " *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 355; 792 NW2d 686 (2010) (citation omitted). Further, in cases involving private rights, a litigant must have "some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of the controversy." *Bowie v Arder*, 441 Mich 23, 42; 490 NW2d 568 (1992) (quotation marks and citation omitted). In child custody matters, "a third party does not have standing to create a custody dispute . . . unless the third party is a guardian of the child or has a substantive right of entitlement to custody of the child." *Id*. at 49.

Michigan's CCA governs custody, parenting time, and child support issues for minor children; it is the exclusive means to pursue child custody rights. MCL 722.24(1); *LeFever*, 336 Mich App at 662. The CCA is "equitable in nature and shall be liberally construed and applied to establish promptly the rights of the child and the rights and duties of the parties involved." MCL 722.26(1). The CCA provides the following parental presumption:

6

If a child custody dispute is between the parents, between agencies, or between third persons, the best interests of the child control. If the child custody dispute is between the parent or parents and an agency or a third person, the court shall presume that the best interests of the child are served by awarding custody to the parent or parents, unless the contrary is established by clear and convincing evidence. [MCL 722.25(1).]

The CCA defines "parent" as "the natural or adoptive parent of a child." MCL 722.22(i). The act does not define "natural parent." A "third person" is "an individual other than a parent." MCL 722.22(k). The CCA says nothing about biology or marriage, see *Van v Zahorik*, 460 Mich 320, 343, 346; 597 NW2d 15 (KELLY, J., dissenting), and its definition of "parent" is circular. Nor has "natural parent" been clearly defined in caselaw. In one case, the Court of Appeals said that the term "natural parent" under the CCA means that the person is a parent related to the child by "blood" rather than by adoption. See *Stankevich v Milliron (On Remand)*, 313 Mich App 233, 236; 882 NW2d 194 (2015) (*Stankevich III*).[4]

More recently, the Court of Appeals included within the ambit of "natural parent" a parent related to the child "by birth" or "through marriage," regardless of whether there is a genetic connection. *LeFever*, 336 Mich App at 651, 665-666.[5] The *LeFever* Court concluded that the term "natural parent" was "elastic enough" to include an unmarried woman who gave birth as a surrogate but whose eggs were not used and who shared no

---

[4] This "related by blood" definition was advanced in *Stankevich I*, which was vacated by this Court. *Stankevich v Milliron*, unpublished per curiam opinion of the Court of Appeals, issued October 17, 2013 (Docket No. 310710), p 2; *Stankevich v Milliron*, 498 Mich 877 (2015) (*Stankevich II*). Although the definition was reiterated on remand, see *Stankevich III*, 313 Mich App at 236, it was inconsequential to the holding, see *LeFever*, 336 Mich App at 677 n 1 (GLEICHER, J., concurring). *Stankevich III* was not appealed.

[5] *LeFever* was not appealed.

7

genetic connection with the twins she birthed. *Id*. at 666. Judge GLEICHER, concurring, proposed an additional analysis, including the proposition that "[a] woman who gives birth to a child is that child's natural mother under the common law, and there is no reason to look elsewhere for the meaning." *Id*. at 677 (GLEICHER, J., concurring).

The CCA must be read in context not only with judicial decisions interpreting it but also within the broad statutory framework of family law. "Under the doctrine [of *in pari materia*], statutes that relate to the same subject or that share a common purpose should, if possible, be read together to create a harmonious body of law." *People v Mazur*, 497 Mich 302, 313; 872 NW2d 201 (2015), citing *People v Harper*, 479 Mich 599, 621; 739 NW2d 523 (2007). The Legislature has provided several explicit statutory avenues for those who did not give birth to a child to establish parentage—through the marital presumption, acknowledgment of parentage, paternity proceedings, the assisted-reproduction statute, and adoption. See, respectively, MCL 722.1433(e); MCL 722.1003(1); MCL 722.711 *et seq*.; MCL 333.2824(6); and MCL 710.24(1) and (2); see also MCL 710.51(6).[6]

---

[6] To the extent that these statutes use gendered language, MCL 8.3b instructs that "[e]very word importing the masculine gender only may extend and be applied to females as well as males."

None of these avenues has been raised by Pueblo. For example, Pueblo did not raise a constitutional or statutory argument that the assisted-reproduction statute must be construed to confer standing. There may be merit to this argument. See *In re Madrone*, 271 Or App 116; 350 P3d 495 (2015) (applying Oregon's presumption of parentage in assisted-reproduction statute to an unmarried same-sex partner where the statute violated Oregon's constitution). Other avenues were simply not available to her. See MCL 710.24 (joint or second-parent adoption unavailable to unmarried couples).

Once parentage has been established, such as through an acknowledgment of parentage or the marital presumption, the Legislature has recognized that the best interests of the child may weigh more heavily than the lack of biological connection. MCL 722.1443(4) (stating that in a revocation of paternity action, "[a] court may refuse to enter

8

In addition, Michigan courts have held that a person with no biological relationship to a child may establish parentage and assert custodial rights as a parent through the equitable-parent doctrine. The doctrine was first recognized in 1987 in *Atkinson*, 160 Mich App 601. In that case, the plaintiff filed for divorce and sought custody rights over the child born during the marriage. *Id*. at 604. The defendant countered that that the plaintiff was not the child's biological father and as such had no parental rights. *Id*. at 604-605. After blood tests excluded the plaintiff as the biological father, the trial court denied him custody and parenting time. *Id*.

The Court of Appeals adopted the plaintiff's request to recognize the equitable-parent doctrine, which was grounded on several footings. First, the panel grounded the doctrine in the equitable nature of and liberal construction afforded to the CCA, MCL 722.26. *Id*. at 609. Second, the panel reasoned that the doctrine is a logical extension of the notion that not only responsibilities, but also rights, flow from deeming nonbiological fathers to be parents who can be ordered to pay child support, citing *Johnson v Johnson*, 93 Mich App 415; 286 NW2d 886 (1979). *Atkinson*, 160 Mich App at 609-610. In *Johnson*, a husband was estopped from disclaiming parenthood of a child born in wedlock where he represented himself as a parent for over nine years from the child's birth. *Johnson*, 93 Mich App at 420. Thus, it makes sense that a person who is not a biological parent may be considered one under the law under certain circumstances where they desire to be a parent and are willing to bear parental rights and responsibilities. See *Atkinson*, 160

an order setting aside a paternity determination, revoking an acknowledgment of parentage, determining that a genetic father is not a child's father, or determining that a child is born out of wedlock if the court finds evidence that the order would not be in the best interests of the child").

9

Mich App at 610. Third, the panel relied on the analogous doctrine of equitable adoption in intestate succession, which it noted has long been recognized by caselaw, *Wright v Wright*, 99 Mich 170 (1984), and was later codified in former MCL 700.111 (replaced in 2000 by the Estates and Protected Individuals Code, MCL 700.1101 *et seq*.). *Atkinson*, 160 Mich App at 611. Finally, the panel emphasized that all custody determinations rest on the paramount consideration given to the best interests of the child, citing *Hackley v Hackley*, 426 Mich 582, 597 (1986), and it was thus unlikely that denying custody and parenting time to an involved de facto parent would be in a child's best interests, see *id*. As the *Atkinson* Court explained, the equitable-parent doctrine recognizes that

> a husband who is not the biological father of a child born or conceived during the marriage may be considered the natural father of that child where (1) the husband and the child mutually acknowledge a relationship as father and child, or the mother of the child has cooperated in the development of such a relationship over a period of time prior to the filing of the complaint for divorce, (2) the husband desires to have the rights afforded to a parent, and (3) the husband is willing to take on the responsibility of paying child support. [*Atkinson*, 160 Mich App at 608-609.]

A little over a decade later, we declined to extend the parameters of the equitable-parent doctrine beyond custody sought over children born or conceived of a marriage. *Van v Zahorik*, 460 Mich 320, 330-331; 597 NW2d 15 (1999). *Van* involved an unmarried opposite-sex relationship during which the parties cohabitated and the defendant, Mary Zahorik, bore two children, but the plaintiff, Scott Van, was excluded as the biological father. *Id*. at 323. This Court rejected Van's attempt to seek parental rights as an equitable parent, reasoning that the CCA does not recognize a theory that extends the doctrine beyond marriage, that doing so would implicate public-policy issues appropriately addressed by the Legislature, and that the strongest rationales underlying the doctrine—

10

reinforcement of the importance of marriage and legitimacy—were not served by its extension. *Id*. at 324, 331-333. The dissenting justices, however, would not have made the availability of the equitable-parent doctrine contingent on marriage. See *id*. at 338-342 (BRICKLEY, J., joined by M. F. CAVANAGH, J., dissenting); *id*. at 342-347 (KELLY, J., dissenting).

Before and in the wake of *Obergefell*, our courts fielded custody disputes over children raised by same-sex partners who were previously unable to legally marry in Michigan. *Obergefell* recognized that the right to marry is a fundamental right and that under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the right and liberty to do so cannot be denied to same-sex couples. *Obergefell*, 576 US 644. The decision rendered Michigan's constitutional and statutory prohibitions against same-sex marriage unenforceable. MCL 551.1; MCL 551.272; Const 1963, art 1, § 25. Among the bases for extending the right to marry was that marriage safeguards children and families and draws meaning from the related rights of childrearing, procreation, and education. *Obergefell*, 576 US at 646. The *Obergefell* Court noted that, absent the right to marry, the children of parents in same-sex relationships are "relegated through no fault of their own to a more difficult and uncertain family life." *Id*. at 668. The availability of marriage for same-sex couples thus affords the permanency and stability important to their children's best interests. See *id*. Following that decision, the Supreme Court of the United States decided *Pavan v Smith*, 582 US 563, 566; 137 S Ct 2075; 198 L Ed 2d 636 (2017), holding that a state could not refuse to list a married same-sex parent on a birth certificate because that was among the " 'constellation of benefits . . . linked to marriage' " recognized by *Obergefell*. *Id*. at 566, quoting *Obergefell*, 576 US at 670.

11

The doctrine of equitable parenthood was extended to same-sex partners who legally married elsewhere before *Obergefell* in *Stankevich III*, 313 Mich App at 240-242. In *Stankevich*, the plaintiff alleged that the same-sex couple had legally married in Canada before the child's birth and that the defendant bore a child from artificial insemination during the marriage. We vacated the Court of Appeals' conclusion that the plaintiff had no standing and remanded the case for reconsideration in light of *Obergefell*. *Stankevich v Milliron*, 498 Mich 877 (2015) (*Stankevich II*). On remand, the Court of Appeals concluded that when a same-sex couple marries in a jurisdiction recognizing the validity of same-sex marriages, the spouse of the biological parent has standing to seek relief under the equitable-parent doctrine. *Stankevich III*, 313 Mich App at 240, 242. The panel remanded for an evidentiary hearing to determine the validity of the alleged Canadian marriage and whether plaintiff could prove that she was an equitable parent. *Id*. at 242. Notably, the Court of Appeals held that plaintiff's allegations afforded her standing to seek equitable-parent status even though pre-*Obergefell*, if a same-sex couple was married in another jurisdiction, their marriage would not be recognized under MCL 551.1[7] and MCL 551.272.[8]

The Court of Appeals declined to extend the equitable-parent doctrine outside the context of marriage in another custody case involving a same-sex couple, *Lake v Putnam*,

---

[7] "Marriage is inherently a unique relationship between a man and a woman. . . . A marriage contracted between individuals of the same sex is invalid in this state." MCL 551.1.

[8] "This state recognizes marriage as inherently a unique relationship between a man and a woman . . . and therefore a marriage that is not between a man and a woman is invalid in this state regardless of whether the marriage is contracted according to the laws of another jurisdiction." MCL 551.272.

316 Mich App 247; 894 NW2d 62 (2016). In *Lake*, the parties were likewise in a long-term relationship during which the defendant, Kerri Putnam, bore a child from artificial insemination. *Id*. at 249. The parties never married, and they separated before *Obergefell* was decided. *Id*. After the separation, Putnam refused to permit the plaintiff, Michelle Lake, to see the child, so Lake filed a custody action. *Id*. The trial court denied Putnam's motion for summary disposition, which argued that Lake lacked standing as a third party, and ordered parenting time for Lake. *Id*. The Court of Appeals granted leave and reversed for entry of summary disposition to Putnam. The majority reasoned:

> While plaintiff claims that she satisfies all requirements under the equitable-parent doctrine, she ignores one crucial, and dispositive, requirement for the equitable-parent doctrine to apply—*the child must be born in wedlock. Van*, 460 Mich at 330 (stating that the equitable-parent doctrine applies only "to a child born or conceived during the marriage"). The child at issue in this case was not born or conceived during a marriage. In fact, it is undisputed that the parties were never married. Therefore, the equitable-parent doctrine does not apply. Had the parties married in another jurisdiction, for example, our conclusion might be different. See, e.g., *Stankevich v Milliron (On Remand)*, 313 Mich App 233, 240-241 (2015). While we acknowledge that the issue presented in this case is complex, we simply do not believe it is within courts' discretion to, at the request of one party and in light of the United States Supreme Court decision in *Obergefell* . . . , retroactively transform an unmarried couple's past relationship into marriage for the purpose of custody proceedings. Stated differently, it is, in our view, improper for a court to impose, several years later, a marriage on a same-sex unmarried couple simply because one party desires that we do so. [*Lake*, 316 Mich App at 252-253.]

The *Lake* panel acknowledged Lake's request to follow an Oklahoma decision that had applied that state's *in loco parentis* doctrine to unmarried same-sex couples with children but held that it could not do the same. First, it explained that, unlike Michigan's equitable-parent doctrine, Oklahoma's *in loco parentis* status "does not only apply to

13

married couples; rather, it appears to apply to anyone 'who has assumed the status and obligations of a parent without a formal adoption.' " *Id*. at 253-254, quoting *Workman v Workman*, 498 P2d 1384, 1386 (1972). Second, the panel observed that in *Van*, 460 Mich at 330-331, this Court "rejected the argument that holding oneself out as a child's parent, alone, is sufficient to be considered that child's parent under the equitable-parent doctrine." *Lake*, 316 Mich App at 254. Third, the panel believed it beyond the appropriate role of the judiciary to retroactively impose the legal ramifications of marriage onto unmarried couples several years after their relationship ended. *Id*. The majority also rejected Lake's argument that the child's constitutional rights were violated, holding that Lake did not have standing to assert them. *Id*. at 256.

Judge SHAPIRO's concurrence found that the facts at bar did not "fully test the scope of *Obergefell*'s application to Michigan's equitable-parent doctrine" but that a different result might be warranted under different facts. *Lake*, 316 Mich App at 257, 259 (SHAPIRO, J., concurring). First, the concurrence rejected Lake's argument that equitable-parent rights arise from the best interests of the child rather than the relationship status of the parties, observing that the Court of Appeals remained bound by *Van*'s rejection of the extension of the doctrine beyond marriage until this Court, or the Legislature, reviewed the issue. *Id*. at 259. However, the concurrence found merit in Lake's legal argument that *Obergefell* "demands extension of the equitable-parent doctrine." *Id*. at 260. But because Lake did not present any evidence in the trial court evincing the parties' intent to marry, the concurrence concluded that relief was not warranted in this particular case. *Id*. at 263.

*Lake* was not appealed in this Court. We declined to review the equitable-parent doctrine's application to unmarried same-sex couples whose relationships ended before

14

*Obergefell* by denying leave in two analogous cases that same year: *Mabry v Mabry*, 499 Mich 997 (2016), and *Kolailat v McKennett*, 499 Mich 996 (2016). Then-Justice MCCORMACK, joined by Justice BERNSTEIN, dissented, urging the Court to grant leave to address whether *Obergefell* compelled extension of the equitable-parent doctrine to custody disputes between same-sex couples who were unconstitutionally prohibited from marrying. *Mabry*, 499 Mich at 997 (MCCORMACK, J., dissenting); *Kolailat*, 499 Mich at 496 (MCCORMACK, J., dissenting).

Two years later in *Sheardown v Guastella*, 324 Mich App 251; 920 NW2d 172 (2018), the Court of Appeals addressed the constitutionality of the definition of "parent" in MCL 722.22(i) as applied to a plaintiff in an unmarried same-sex relationship whose partner bore a child using a sperm donor during their pre-*Obergefell* relationship. The Court determined that the definition did not violate equal protection because it applies equally to same-sex and opposite-sex unmarried couples. *Id*. at 261; see also *Stankevich III*, 313 Mich App at 238 (noting that its application of the definition of "parent" under the CCA did not run afoul of *Obergefell* because it applies equally to same-sex and opposite-sex married couples). Notably, the Court determined that *Obergefell*'s principles did not apply where the plaintiff was not married and had "disavowed any interest . . . in going back in time in an attempt to determine whether the parties would have been married had they had the legal option to do so prior to *Obergefell*." *Id*. at 258.

In sum, in crafting the doctrine, the *Atkinson* Court relied on the liberal and equitable nature of the CCA, the principle that deeming nonbiological fathers to be parents entitles them to parental rights, the importance of the best interests of the child, and the existing doctrine of equitable adoption. In *Van*, this Court declined to extend the doctrine beyond

15

the institution of marriage in deference to legislative policy preferences favoring marriage. The Court of Appeals recently rejected a constitutional challenge to the CCA's statutory language in *Sheardown*. However, since *Atkinson*, the CCA's definition of "parent" has been expanded through the equitable-parent doctrine to include parents who are neither adoptive parents nor parents by blood. While courts have been willing to apply the equitable-parent doctrine to same-sex couples, as the Court of Appeals did in *Stankevich III*, 313 Mich App at 240, 242, the Court of Appeals and this Court have previously refused to extend the doctrine to couples who were not married. See *Van*, 460 Mich at 320; *Lake*, 316 Mich App at 252-253.

## IV. ANALYSIS

### A. WHETHER THE EQUITABLE-PARENT DOCTRINE SHOULD BE EXTENDED

Pueblo did not carry the child, nor did she contribute genetic material. Yet she asserts standing to seek custody as a putative parent who, before 2015, was in a marriage-like relationship with another woman who birthed a child through in vitro fertilization. "[T]he CCA does not specifically address the unique question presented in this case. The United States Constitution fills this gap." *LeFever*, 336 Mich App at 682 (GLEICHER, J., concurring). Pueblo argues that she has standing to seek custody under the equitable-parent doctrine. We agree that Pueblo should have the opportunity to prove that she is entitled to assert her rights as an equitable parent.[9]

---

[9] Although the dissent questions "the soundness of the equitable-parent doctrine itself," the parties have not asked us to reconsider the doctrine.

16

A quick recap of the doctrine in its current state: A spouse[10] who is not a biological parent has standing to seek custody of a child born or conceived during their marriage when (1) the would-be equitable parent and the child acknowledge the parental relationship or the biological or adoptive parent has cultivated the development of a relationship over a period of time, (2) the would-be equitable parent desires to have the rights afforded a parent, and (3) the would-be equitable parent is willing to pay child support. *Mabry*, 499 Mich at 998 (MCCORMACK, J., dissenting); see also *Atkinson*, 160 Mich App at 608-609.

The Court of Appeals rejected Pueblo's argument that she was a parent, relying as it was bound to do on the closely analogous decision in *Lake*, 316 Mich App at 252. But before 2015, Michigan unconstitutionally prohibited same-sex couples from marrying and refused to recognize legal marriages performed in other jurisdictions. See MCL 551.1; MCL 551.271; Const 1963, art 1, § 25. Consequently, a same-sex partner did not have the option to adopt their spouse's child or to marry their pregnant partner and benefit from the marital presumption of parentage. See, e.g., MCL 710.24; MCL 722.1433(e); MCL 333.2824. Further, unmarried same-sex couples were not permitted to adopt through second-parent adoption. MCL 710.24. *Obergefell* rendered Michigan's unconstitutional

---

[10] It bears noting that the equitable-parent doctrine may be invoked by any married person, though it was initially framed within a husband's bid for custody of nonbiological children of a marriage. See *Atkinson*, 160 Mich App at 608-609; *Stankevich III*, 313 Mich App at 233. Several reasons support this outcome. The doctrine itself is concerned with protecting close de facto parent-child relationships despite the absence of biological connection—the would-be equitable parent's sex is irrelevant. Further, the Equal Protection Clause requires that all persons similarly situated be treated alike under the law. *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 318; 783 NW2d 695 (2010). Married women in same-sex marriages are similarly situated to married men in opposite-sex marriages who would be able to pursue custody for children born to or adopted by their spouses through the equitable-parent doctrine. Therefore, women should not be treated differently from men.

bar on same-sex marriage unenforceable, holding that denying same-sex couples the opportunity to marry was an unconstitutional deprivation of equal protection and due process. *Obergefell*, 576 US at 675-676. But this legal development came too late for those same-sex couples whose marriage-like relationships had already ended and who had not married in another jurisdiction.

*Obergefell* made clear that the denial of the ability to marry was a denial of same-sex couples' constitutional rights. "The essence of the Equal Protection Clauses is that the government not treat persons differently on account of certain, largely innate, characteristics that do not justify disparate treatment." *Crego v Coleman*, 463 Mich 248, 258; 615 NW2d 218 (2000). *Obergefell* emphasized generally the importance of the various benefits that the states have connected to marriage, referred to as the "constellation of benefits." *Obergefell*, 576 US at 670 (including "taxation; inheritance and property rights; rules of intestate succession; spousal privilege in the law of evidence; hospital access; medical decisionmaking authority; adoption rights; the rights and benefits of survivors; birth and death certificates; professional ethics rules; campaign finance restrictions; workers' compensation benefits; health insurance; and child custody, support, and visitation rules"). Further, *Obergefell* specifically placed much importance on the effect of the unconstitutional prohibition on marriage on the children of same-sex couples:

> Without the recognition, stability, and predictability marriage offers, their children suffer the stigma of knowing their families are somehow lesser. They also suffer the significant material costs of being raised by unmarried parents, relegated through no fault of their own to a more difficult and uncertain family life. The marriage laws at issue here thus harm and humiliate the children of same-sex couples. [*Obergefell*, 576 US at 668.]

18

Recognition of equitable parenthood is one of the "constellation of benefits" associated with marriage in Michigan. *Obergefell*, 576 US at 670. Because the parties are the same sex, they were barred from marrying in Michigan, where they resided during the relationship. Pueblo was subject to dissimilar treatment because she could not marry her same-sex partner. Unlike opposite-sex couples, same-sex couples did not have the option to obtain parental rights through marriage. We can right some of this wrong by invoking our equity jurisprudence, which "mold[s] its decrees to do justice amid all the vicissitudes and intricacies of life." *Spoon-Shacket Co v Oakland Co*, 356 Mich 151, 163; 97 NW2d 25 (1959) (citation omitted).

As a matter of equity and constitutional law, we are compelled to treat same-sex couples equally. Same-sex couples have the constitutional right to marry and to all the attendant benefits of marriage. *Id*.; see also *Pavan*, 582 US at 567. Withholding the benefit of the equitable-parent doctrine from couples who were previously unconstitutionally prohibited from marrying would perpetuate the harms identified in *Obergefell*: that denying same-sex couples the same legal treatment in marriage and all the benefits afforded to opposite-sex couples demeans them, stigmatizes their children and families, and teaches society that they are inferior. *Obergefell*, 476 US at 665, 670-671. Given the ruling in *Obergefell*, we cannot justifiably deny same-sex couples—who would have married before the arrival of a child but for unlawful prohibitions—the privilege of invoking the equitable-parent doctrine because of their sexual orientation. Accordingly, "*Obergefell* demands extension of the equitable-parent doctrine."[11] *Lake*, 316 Mich App at 260 (SHAPIRO, J.,

---

[11] Pueblo did not raise an argument grounded in Michigan's Due Process and Equal Protection Clauses.

concurring). Therefore, we narrowly extend the equitable-parent doctrine to Pueblo and other similarly situated persons who were unable to marry during their same-sex relationships because of discriminatory and unconstitutional Michigan laws but who nonetheless developed de facto parent-child relationships with the children born or adopted by their same-sex partners during the time they would have otherwise been married.

And the underlying rationale of the equitable-parent doctrine is served by this extension. The CCA is equitable in nature and must be construed liberally. MCL 722.26(1). The best interests of the child, with whom the would-be equitable parent fostered a relationship, are paramount. The children of same-sex partners bear no lesser rights to the enjoyment and support of two parents than children born to married opposite-sex parents. Many same-sex couples likely would have chosen to marry before taking on joint responsibility for a child had they been they legally permitted to do so. But for the inability of these couples to legally marry because of this state's unconstitutional prohibitions, the equitable-parent doctrine would be available to them.

This extension is also consistent with recent developments in the law recognizing that federal and state law protects people from discrimination on the basis of sexual orientation. The Supreme Court of the United States held in *Bostock v Clayton Co*, 590 US ___; 140 S Ct 1731, 1741; 207 L Ed 2d 218 (2020), that discrimination based on sexual orientation or gender identity is encompassed by Title VII's prohibition of discrimination "because of such individual's . . . sex." We subsequently held in *Rouch World v Dep't of Civil Rights*, 510 Mich 398; 987 NW2d 501 (2022), that our state's antidiscrimination law protects against discrimination based on sexual orientation. And the Legislature recently

20

codified that decision. MCL 37.2102, as amended by 2023 PA 6 (adding "sexual orientation" and "gender identity or expression" as protected categories).

We need not overrule our decision in *Van* to extend the equitable-parent doctrine as we do today because that case is clearly distinguishable.[12] *Van* requires that a child be born in wedlock for the equitable-parent doctrine to apply, centering the state's public policy of marriage in its reasoning. *Van*, 460 Mich at 330. In particular, *Van* found it inappropriate to extend the benefits of marriage to those who deliberately eschewed marriage. *Id*. at 332. But a necessary assumption of the *Van* case was the parties' decision not to legally marry despite their ability to do so. See *id*. Same-sex partners in this state did not have that choice pre-*Obergefell*. Stated differently, same-sex partners in a pre-*Obergefell* world neither had access to nor neglected a legal pathway to marriage as did the parties in *Van*. "When the parents themselves did not choose not to marry, but instead had that choice made for them by our state's laws, and the parents otherwise demonstrated the same commitment and legitimacy as married parents, their children should not be barred from the potential benefits of our common-law rule." *Mabry*, 499 Mich at 999-1000 (MCCORMACK, J., dissenting).

Further, *Van* saw extension of the doctrine to unmarried couples as undermining the public policy in favor of marriage. *Van*, 460 Mich at 332. No such justification exists when carving out a narrow, backward-looking extension. Instead, denying this marital benefit to those in Pueblo's position "does nothing to support opposite-sex parenting, but rather merely serves to endanger children of same-sex parents by denying them ' "the

---

[12] Importantly, Pueblo did not ask us to overrule *Van*.

21

immeasurable advantages that flow from the assurance of a stable family structure . . . ." ' " *Golinski v US Office of Personnel Mgt*, 824 F Supp 2d 968, 992 (ND Cal, 2012), quoting *Goodridge v Dep't of Pub Health*, 440 Mass 309, 335; 798 NE2d 941 (2003) (citation omitted). We note that *Van*'s requirement that a child be born during marriage remains applicable to opposite-sex couples generally and same-sex couples to whom a child was born post-*Obergefell*.

We do, however, overrule *Lake v Putnam* to the extent it is inconsistent with our holding today. The Court of Appeals in *Lake* justified the denial of the extension of the equitable-parent doctrine as an untenable retroactive transformation of the same-sex couple's relationship into a marriage. *Lake*, 316 Mich App at 253. The Court viewed expanding the doctrine as outside its discretion and lacking a solid rationale. *Id*. But *Lake*'s concern about retroactively and unilaterally creating a marriage relationship against the parties' wishes is remedied by requiring the person seeking custody to show, by a preponderance of the evidence, that the parties would have married had they been legally permitted to do so in Michigan. Moreover, ensuring that constitutional rights are safeguarded, and that further harms are not perpetrated, is our duty. "A major function of the judiciary is to guarantee the rights promised in our Constitution." *Bauserman v Unemployment Ins Agency*, 509 Mich 673, 693; 983 NW2d 855 (2022), quoting 2 Official Record, Constitutional Convention 1961, p 2196 (cleaned up). And for the reasons above, we believe that extension is justified as a matter of equity and constitutional law.

Haas suggests that the parties' failure to avail themselves of marriage in another jurisdiction during the parties' relationship is determinative. However, imposing such a per se rule would be inconsistent with Michigan's contemporaneous unconstitutional

22

prohibition on the recognition of such a marriage, which presumably also would have precluded application of the equitable-parent doctrine. See *Mabry*, 499 Mich at 998 (MCCORMACK, J., dissenting). In light of this unconstitutional bar that limited the exercise of any marriage rights they might obtain in another jurisdiction, even a same-sex couple residing in Michigan that otherwise would marry might decline to do so. Michigan law imposed the barrier to marriage for same-sex couples, and that Michigan law was struck down; that legal marriage might have been available in another state or country is not dispositive. Pueblo's problem is that she was prohibited from marrying or having a marriage recognized *here*.

Haas and the dissent express concern that expanding the equitable-parent doctrine will create a legal morass in other areas of the law, including divorce and tort. We disagree. We take a narrow approach based on the facts before us, the existing equitable-parent doctrine which remains binding law, and the Supreme Court's recognition of marriage equality in *Obergefell*. We do not decide whether successful invocation of the equitable-parent doctrine to gain child custody standing will implicate other rights and liabilities associated with marriage. Haas also contends that her constitutional rights will be violated by imposing upon her a marriage that she did not desire. However, whether the parties mutually desired to marry but could not is a fact-specific inquiry best addressed on remand where the trial court can evaluate evidence and judge credibility. Because we decide that Pueblo may pursue standing as an equitable parent, we do not address her alternative claims.

## B. THE PARAMETERS OF THE EXTENSION

Having decided that *Obergefell* and principles of equity require us to extend the equitable-parent doctrine, we outline the threshold test for standing for Pueblo and other would-be equitable parents in her position. We hold that such a would-be equitable parent has standing if they demonstrate by the preponderance of the evidence that the parties would have married before the child's birth or conception but did not because unconstitutional laws prevented them from doing so. See *Lake*, 316 Mich App at 262-263 (SHAPIRO, J., concurring).

To assist in creating the test, we find compelling the discussion in the Oregon case *In re Madrone*, 271 Or App 116, 127-129; 350 P3d 495 (2015); see also *Lake*, 316 Mich App at 262 (SHAPIRO, J., concurring) (noting that he would adopt Oregon's approach). In *Madrone*, the Oregon Court of Appeals crafted the factual inquiry to be applied when extending the presumption of parentage in its artificial-insemination statute to same-sex partners of biological mothers—in other words, the court considered how to apply the remedy for an analogous constitutional violation previously wrought by an Oregon statute. *Madrone*, 271 Or App at 123. In Michigan, marriage was unavailable to same-sex couples before 2015. Like the *Madrone* Court, we believe that whether the choice to marry was denied to a particular same-sex couple is key. See *id.* at 128. It follows that the equitable-parent doctrine should not apply to a same-sex couple who would have chosen commitment but not marriage, just as the doctrine does not apply to an opposite-sex couple who chose not to marry. See *id.*; see also *Van*, 460 Mich App at 330, 332. Therefore, the analysis should focus on whether the parties would have married but for the unconstitutional prohibition.

24

While the Court of Appeals in *Lake* was concerned about imposing a retroactive marriage "simply because one party desires that we do so," *Lake*, 316 Mich App at 253, and the dissent echoes this discomfort, this concern is "fully addressed by a factual inquiry into the facts as they existed at the time the child was born or conceived," *id*. at 260 (SHAPIRO, J., concurring). This is a contemporaneous inquiry concerning the mutual intent of the parties. While, as Haas and the dissent emphasize, there may be evidentiary challenges including those caused by the passage of time and one party's denial of an intent to marry, that is not a compelling reason to refuse to extend the doctrine.

While this hypothetical inquiry may have practical difficulties, we find instructive the *Madrone* Court's discussion of relevant factors that support an inference that same-sex partners would have married but for the prior unconstitutional bar:

> Whether a particular couple would have chosen to be married, at a particular point in time, is a question of fact. In some cases, the answer to that question will be obvious and not in dispute. . . . In other cases, the answer will be less clear. A number of factors may be relevant to the fact finder's determination. A couple's decision to take advantage of other options giving legal recognition to their relationship—such as entering into a registered domestic partnership or marriage when those choices become available—may be particularly significant. Other factors include whether the parties held each other out as spouses; considered themselves to be spouses (legal purposes aside); had children during the relationship and shared childrearing responsibilities; held a commitment ceremony or otherwise exchanged vows of commitment; exchanged rings; shared a last name; commingled their assets and finances; made significant financial decisions together; sought to adopt any children either of them may have had before the relationship began; or attempted unsuccessfully to get married. We hasten to emphasize that the above list is not exhaustive. Nor is any particular factor dispositive . . . , given that couples who choose not to marry still may do many of those things. Instead, we view the factors as tending to support, but not compelling, an inference that a same-sex couple would have

25

married had that choice been available.[13]  [*In re Madrone*, 271 Or App at 128-129.]

We adopt this discussion to guide application of the factual inquiry. If the intent to marry is disputed, a would-be equitable parent must prove by a preponderance of the evidence that the couple would have married based on their contemporaneous conduct, in consideration of the illustrative but nondispositive factors outlined above. If that threshold test for standing is satisfied, the court may evaluate the equitable-parent factors to determine whether the would-be equitable parent has standing to seek custody and parenting time.

## V.  APPLICATION

Here, the parties did not legally marry in Michigan or another jurisdiction.[14]  Pueblo has made a sufficient showing in the pleadings to survive summary disposition under MCR

---

[13] *Madrone* also noted that evidence that one or both partners rejected the institution of marriage is not necessarily determinative and should be weighed in light of what each partner's views would have been had marriage not been banned. *Madrone*, 217 Or App at 129.

[14] Had the parties legally married before the child's birth, Pueblo would be entitled to the marital presumption that she is a parent. See MCL 722.1433(e) (stating that a "man . . . is presumed to be the child's father by virtue of his marriage to the child's mother at the time of the child's conception or birth"); MCL 333.2824 (stating that "the name of the husband at the time of conception or, if none, the husband at birth shall be registered as the father of the child"); MCL 552.29 (stating that "the legitimacy of all children begotten before the commencement of any action [for divorce] shall be presumed"); see also *Serafin v Serafin*, 401 Mich 629; 258 NW2d 461 (1977) (holding that there is a strong but rebuttable presumption that a husband is a child's father); MCL 8.3b ("Every word importing the masculine gender only may extend and be applied to females as well as males.").

Further, the assisted-reproduction statute provides a presumption of parentage to the nonbirth parent for children born to married parents through assisted reproduction. MCL 333.2824(6); see also *LeFever*, 336 Mich App at 679 (GLEICHER, J., concurring) ("A

26

2.116(C)(8) on standing grounds. In a motion under MCR 2.116(C)(8), we accept all factual allegations as true and construe the facts in the light most favorable to the nonmovant. *El-Khalil*, 504 Mich at 160. The parties agreed to use in vitro fertilization, and the child was born during their relationship. Both parties parented the child from birth, sharing custody and parenting time, including for some time after their breakup. Pueblo desires to facilitate a close and continuing parent-child relationship with JPHP. And Pueblo requested custody, parenting time, and calculation of child support. Therefore, Pueblo's allegations that she (1) cultivated the development of a relationship with the child over a period of time, (2) desires to have parental rights, and (3) is willing to pay child support are sufficient to advance her claim for equitable parenthood. See *Atkinson*, 160 Mich App at 608-609. Pueblo has also alleged facts entitling her to a threshold determination on whether the parties would have married but for Michigan's unconstitutional bar on same-sex marriage under the inquiry set forth above.

## VI. CONCLUSION

Today we announce a limited extension of the equitable-parent doctrine for individuals in same-sex couples who were unconstitutionally prevented from marrying

---

married woman in a same-sex relationship should have precisely the same right" as a husband on equal footing.).

A "father" under the Acknowledgment of Parentage Act, MCL 722.1001 *et seq*., is defined as "the man who signs an acknowledgment of parentage of a child," MCL 722.1002(d). We see no impediment to any person establishing parental rights by signing an acknowledgment of parentage. See also *In re Daniels Estate*, 301 Mich App 450, 456; 837 NW2d 1 (2013) ("Nothing in the Acknowledgement [sic] of Parentage Act requires that the man completing the acknowledgement form actually be the child's biological father."); MCL 8.3b.

before *Obergefell*. On remand, the trial court must conduct an evidentiary hearing on whether Pueblo has standing as an equitable parent, applying the threshold test that we announce today. Pueblo must demonstrate by a preponderance of the evidence that she and defendant would have chosen to marry before the child's birth but for Michigan's unconstitutional exclusion of same-sex couples from the right to marry. Should she do so, she has the right to a best-interest evaluation for custody and parenting time. We reverse the Court of Appeals' judgment and remand to the trial court for further proceedings consistent with this opinion.

Megan K. Cavanagh
Elizabeth T. Clement
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden

CARRIE PUEBLO,

      Plaintiff-Appellant,

v                                                            No. 164046

RACHEL HAAS,

      Defendant-Appellee.

_____

BOLDEN, J. (*concurring*).

I concur with the Court's opinion in this matter. I write separately to draw attention to a subsidiary argument raised—but not fully developed—by plaintiff that I believe merits further attention from the Legislature. Given that many of our state laws around marriage, out-of-wedlock parenting, and reproductive technologies were enacted without consideration of *Obergefell v Hodges*, 576 US 644; 135 S Ct 2584; 192 L Ed 2d 609 (2015), there appear to be many lingering puzzles remaining about how the laws as written can fit the practical realities of same-sex relationships.

Marriage, of course, offers a presumption that both spouses are the natural parents of the child for many legal purposes. See, e.g., MCL 700.2114(1)(a) ("If a child is born or conceived during a marriage, both spouses are presumed to be the natural parents of the child for purposes of intestate succession."). And had the parties had the legal avenue of marriage available to them and chosen to pursue it, this case might have been very different—even unnecessary. However, statutory issues remain because state law does not yet fully contemplate the interaction between same-sex relationships and parenting. The

Legislature should give clarity to families and consider these lingering questions surrounding how same-sex couples resolve custodial disputes if the relationship is terminated.

The United States Supreme Court has held that the relationship between a parent and child is a fundamental right and "that the relationship between parent and child is constitutionally protected." *Quilloin v Walcott*, 434 US 246, 255; 98 S Ct 549; 54 L Ed 2d 511 (1978). In accordance with this holding, both Congress and the Michigan Legislature have since codified protections for parental rights through the Respect for Marriage Act, PL 117-228, 136 Stat 2305, and the Child Custody Act (CCA), MCL 722.21 *et seq*., respectively. The Court of Appeals has described the CCA as " 'a comprehensive statutory scheme' " governing child support and parenting time and offering "the exclusive means of pursuing" rights to a child's custody. *LeFever v Matthews*, 336 Mich App 651, 662, 674, 681 n 2; 971 NW2d 672 (2021), quoting *Van v Zahorik*, 460 Mich 320, 327; 597 NW2d 15 (1999). The case before us demonstrates the limitations of the statute's present form and underscores its potential to violate constitutional principles of parental rights.

## I. BACKGROUND

Under the CCA, a parent is defined as the "natural or adoptive parent of a child." MCL 722.22(i). The CCA does not expressly define "natural parent," but the Court of Appeals has held that it requires such a parent to be related to the child by "blood" rather than adoption. See, e.g., *Stankevich v Milliron (On Remand)*, 313 Mich App 233, 236; 882 NW2d 194 (2015) (applying the part of the definition of "natural" from *Random House Webster's College Dictionary* (2005) indicating that it means " 'related by blood rather

2

than by adoption' "). In *LeFever*, the Court of Appeals concluded that the statutory term "natural parent" was "elastic enough" to allow a more expansive interpretation to include a parent who gestated and birthed the children without genetic link as a "natural parent" under the CCA. *LeFever*, 336 Mich App at 662.[1]

Besides "blood" or birth, the CCA offers a third avenue by which a person may be deemed a "natural parent"—Michigan's equitable-parent doctrine. Under this doctrine, a nonbiological father of a child born or conceived during a marriage may be considered the natural father of that child where:

> (1) the husband and the child mutually acknowledge a relationship as father and child, or the mother of the child has cooperated in the development of such a relationship over a period of time prior to the filing of the complaint for divorce, (2) the husband desires to have the rights afforded to a parent, and (3) the husband is willing to take on the responsibility of paying child support. [*Van*, 460 Mich at 330 (quotation marks and citation omitted).]

In this case, the Court of Appeals held that plaintiff was not a "natural parent" by blood, by birth, or through the equitable-parent doctrine. *Pueblo v Haas*, unpublished per curiam opinion of the Court of Appeals, issued December 28, 2021 (Docket No. 357577). The panel likened plaintiff's case to *Lake v Putnam*, 316 Mich App 247, 255; 894 NW2d 62 (2016). In *Lake*, the plaintiff and the defendant were in a romantic relationship that lasted more than a decade. *Id*. at 249. During that relationship, the plaintiff gave birth to a child conceived through a medical procedure. The couple raised the child together until their relationship terminated. The plaintiff then sued the defendant, seeking parenting time

---

[1] The defendant in *LeFever* also argued that a narrow interpretation of "natural parent" under the CCA would violate her constitutional rights to substantive due process and equal protection. The *LeFever* Court, however, did not reach the constitutional arguments because the decision was based on a statutory analysis. *Id*. at 659.

with the child and asserting that she satisfied all the requirements of the equitable-parent doctrine because she had equally participated in raising the child while the couple was together. *Id*. The defendant unsuccessfully moved for summary disposition on the ground that the plaintiff lacked standing. On appeal, the Court of Appeals reversed, relying on *Van*, 460 Mich at 330, explaining that the plaintiff ignored one critical—and dispositive—requirement; namely, "*the child must be born in wedlock*." *Lake*, 316 Mich App at 252.

The Court of Appeals in this case was bound by *Lake*, which presented a parallel set of facts. As in *Lake*, plaintiff and defendant were in a romantic relationship for about a decade through which the parties never married, and defendant gave birth to a child conceived through a medical procedure. *Pueblo*, unpub op at 1. Plaintiff sued under the CCA seeking joint legal and physical custody of the child. *Id*. Defendant successfully moved for summary disposition asserting, among other things, that plaintiff (like the plaintiff in *Lake*) lacked standing to seek custody of the child. *Id*. at 2. Plaintiff appealed after unsuccessfully seeking reconsideration. *Id*.

The Court of Appeals followed *Lake* and affirmed. The panel rejected plaintiff's argument that she has standing under the " 'elastic definition' " of natural parent as adopted in *LeFever*. *Id*. at 5. The panel distinguished *LeFever* by noting that the defendant in *LeFever* had given birth to the children, thereby creating an equivalent of "the physical connection of being a parent by virtue of genetic relationship," which plaintiff lacks. *Id*. at 6. The Court of Appeals also discounted the fact that same-sex couples could not legally marry at the time of the child's conception and birth, given that *Lake* declined to expand the scope of the equitable-parent doctrine by imposing the status of marriage upon a couple

4

who had never married. *Id*. In the panel's view, because this point of law has not changed, defendant could not achieve the status of natural parent under the equitable-parent doctrine.

After *Obergefell* held that depriving same-sex couples of the right to marry is a violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the Court of Appeals extended the equitable-parent doctrine to same-sex couples who had legally married outside Michigan. See *Stankevich (On Remand)*, 313 Mich App at 240. The *Lake* Court, however, declined to extend standing under the doctrine to parties who had separated pre-*Obergefell*, because the *Lake* majority believed that such an extension of the doctrine would be the equivalent of imposing a retroactive marriage on the parties and it was not willing to do so upon the unilateral request of one party. *Lake*, 316 Mich App at 253.

But considering these questions through a constitutional lens might have brought different results. Under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the door to parental rights for unmarried, same-sex parents remains open. The analysis in *Obergefell* centered on four principles that demonstrate why constitutional marriage guarantees must apply with equal force to same-sex couples.[2] These principles stress that confusion surrounding the status of the children of same-sex couples is a source of social instability and suffering, that the right to marriage "safeguards children and

---

[2] These principles are (1) the right of personal autonomy to make choices, (2) the special and committed nature of marriage and family, (3) safeguarding children and families, thus drawing meaning from related rights of childrearing, procreation, and education, and (4) that marriage is a keystone of our social order. *Obergefell*, 576 US at 665-669. The application of these principles to same-sex couples stems from the Court's recognition that "same-sex couples have the same right as opposite-sex couples to enjoy intimate association." *Id*. at 667.

families," and that this right draws meaning from the *related rights of procreation and childrearing*.[3] *Obergefell*, 576 US at 667.

## II. ANALYSIS

### A. EXTENDING THE EQUITABLE-PARENT DOCTRINE AS A BASIS FOR STANDING

In his *Lake* concurrence, Judge SHAPIRO proposed a solution to the equitable-parent doctrine's disparate treatment of opposite-sex and same-sex parents inspired by the Oregon Court of Appeals' decision in *In re Madrone*, 271 Or App 116, 128-129; 350 P3d 495 (2015). *Lake*, 316 Mich App at 261 (SHAPIRO, J., concurring). In *Madrone*, the question was how to determine whether an unmarried same-sex couple is similarly situated to a married opposite-sex couple for purposes of the state's artificial-insemination statute. The court reasoned that because the distinction between married and unmarried heterosexual couples is that married couples have chosen to be married while the unmarried couples have chosen not to be, *choice* would be the key to determining whether the statute applied to a same-sex couple. *Madrone*, 271 Or App at 128. Accordingly, given that same-sex couples in Oregon had also been statutorily deprived of the choice to marry before *Obergefell*, the governing inquiry would be whether a same-sex couple "*would have* chosen to marry before the child's birth had they been permitted to." *Id*. The court held that this inquiry presents a question of fact to be determined on a case-by-case basis where fact-finders may consider varying factors including whether the couple registered as domestic partners, held each other out as spouses, shared parenting responsibilities during the

---

[3] More starkly, the Court stated that "[t]he marriage laws at issue here . . . harm and humiliate the children of same-sex couples." *Id*. at 668.

relationship, held a commitment ceremony, wore or exchanged rings, and shared finances. *Id*. at 128-129. These factors could be considered to support an inference that a same-sex couple would have married had that choice been available. *Id*. at 129.

Judge SHAPIRO suggested adopting this approach in Michigan and would have held "that a party is entitled to seek equitable parental rights arising out of a same-sex nonmarital relationship when a preponderance of the evidence shows that *but for* the ban on same-sex marriage in the parties' state of residency, they would have married before the birth of the child." *Lake*, 316 Mich App at 262-263 (SHAPIRO, J., concurring) (emphasis added). Under this expansion of the doctrine, if standing is contested, as it is in the instant matter, an evidentiary hearing would generally be required to determine by a preponderance of the evidence whether the nonbiological parent and the biological parent would have been married but for the ban on same-sex marriage. *Id*. at 263.

Today, the majority adopts this approach and offers a limited extension of the equitable-parent doctrine for partners in same-sex relationships who were unconstitutionally prevented from marrying before *Obergefell*. On remand, plaintiff must show by a preponderance of the evidence that she and defendant would have chosen to marry before the child's birth but for Michigan's unconstitutional ban on same-sex marriage. I agree with this approach.

B.  EXPANDING STANDING UNDER THE EQUITABLE-PARENT DOCTRINE

The Court of Appeals developed the equitable-parent doctrine to permit *married*, nonbiological parents to secure parental rights. See *Atkinson v Atkinson*, 160 Mich App 601; 408 NW2d 516 (1987). However, before this decision, this Court refused to apply the

7

equitable-parent doctrine to an unwed nonbiological parent holding that "the extension of substantive rights regarding child custody implicates significant public policy issues and is within the province of the Legislature, not the judiciary." *Van*, 460 Mich at 331. The doctrine has since been applied in varying circumstances but has never been enacted by statute.

Though the equitable-parent doctrine has never been enacted into statutory law, the Michigan Legislature has signaled elsewhere that marriage is not central to parenthood. In addition to allowing unmarried biological fathers to establish paternity under the Genetic Parentage Act, MCL 722.1461 *et seq.*, the Legislature allows unmarried men to pursue parental rights under the Revocation of Paternity Act, MCL 722.1431 *et seq.*[4] These statutes signal that the Legislature has considered the practical realities that relationships may result in children but not marriage.

Additionally, in *Lipnevicius v Lipnevicius*, unpublished per curiam opinion of the Court of Appeals, issued August 26, 2010 (Docket No. 289073), the Court of Appeals addressed the equitable-parent doctrine in a case involving a legal father seeking custody against the claims of the child's mother and the biological father. The panel noted that the equitable-parent doctrine can encroach on what has traditionally been the Legislature's arena and stated that, in its view, the "equitable parent doctrine irreconcilably conflicts

---

[4] The Revocation of Paternity Act defines an "alleged father" as "a man who by his actions could have fathered the child" in question. MCL 722.1433(c). Under the act, an "alleged father" may pursue an action to deprive a "presumed father"—defined as "a man who is presumed to be the child's father by virtue of his marriage to the child's mother at the time of the child's conception or birth," MCL 722.1433(e)—of parental rights.

with statutes intended to occupy the entire field of child custody regulation." *Id*. at 3.[5] The proposition that the equitable-parent doctrine is sufficient to ground standing has not been universally accepted. This case shows exactly why it may be necessary for the Legislature to address these issues.

That said, aside from the question whether the Legislature should address the equitable-parent doctrine, the CCA has ambiguities that should be clarified. As the majority points out, the CCA says nothing about biology or marriage and its definition of "natural parent" is unclear. As Justice KELLY pointed out in her dissent in *Van*, in custody disputes "the Legislature has decreed that the overriding concern is not the ultimate preservation by the state of the institution of marriage. It is, instead, the attainment of the best interests of the children." *Van*, 460 Mich at 346 (KELLY, J., dissenting). Therefore, the Legislature should consider how to amend the CCA for consistency, so that the best interests of a child are of utmost concern and given due consideration when situations like these arise.

The Legislature should also consider whether to enact a formal procedure to address situations like plaintiff's. For example, Michigan law provides that a "child conceived by a married woman with consent of her husband following the utilization of assisted reproductive technology is considered to be the legitimate child of the husband and wife." MCL 333.2824(6). But there is no *explicit* right extended for a female spouse who consents

---

[5] Further, Michigan stands nearly alone in its continued commitment to the equitable-parent doctrine. See *Titchenal v Dexter*, 166 Vt 373, 384-385; 693 A2d 682 (1997) (noting that "[v]ery few jurisdictions have embraced the equitable-parent doctrine adopted in *Atkinson*").

9

to her partner's conceiving a child using assisted reproductive technology.[6] "The essence of the Equal Protection Clauses is that the government not treat persons differently on account of certain, largely innate, characteristics that do not justify disparate treatment." *Crego v Coleman*, 463 Mich 248, 258, 615 NW2d 218 (2000). Because our reproductive-assistance technology cannot—at least currently—produce a child who is genetically related to both same-sex parents, a nonbiological parent of a child born to a same-sex couple that was unconstitutionally barred from marriage pre-*Obergefell* may be precluded from standing to seek a custodial relationship with that child under the CCA.

In *Troxel v Granville*, 530 US 57, 120 S Ct 2054; 147 L Ed 2d 39 (2000), the United States Supreme Court affirmed the fundamental right of parents to make certain decisions for their children. *Troxel* summarizes the long history of the fundamental liberty interest parents have in the "care, custody, and control of their children[.]" *Id*. at 65 (opinion of O'Connor, J.). *Troxel* also highlights that the " 'liberty' " protected by the Due Process Clause of the Fourteenth Amendment includes the right of parents to " 'establish a home and bring up children' . . . ." *Id*., quoting *Meyer v Nebraska*, 262 US 390, 399; 43 S Ct 625; 67 L Ed 1042 (1923). And " 'those who nurture [a child] and direct his destiny have *the right*, coupled with the high duty, to recognize and prepare him for additional obligations.' " *Troxel*, 530 US at 65 (opinion of O'Connor, J.), quoting *Pierce v Society of Sisters*, 268 US 510, 535; 45 S Ct 571; 69 L Ed 1070 (1925) (emphasis added).

---

[6] While the rules of construction would extend this right to a married female spouse, MCL 8.3b, MCL 333.2824(6) does not do so explicitly and is therefore confusing to same-sex couples trying to navigate the statute.

Plaintiff argues that she was involved in nurturing the child even before the child was conceived. Plaintiff alleges that she and defendant decided to use in vitro fertilization to bring a child into the world together. Plaintiff further alleges that both parties acted as parents to the child from birth, sharing custody and parenting time even after their separation. Plaintiff alleges that this relationship continued until defendant demanded that she cease contact with the child, at which point plaintiff sought a legal avenue to continue to parent the child. Absent our extension of the equitable-parent doctrine in this case, plaintiff may not have had standing to do so.

## III. CONCLUSION

I concur fully with the majority's opinion. However, I write separately to state that the Legislature should give clarity for children born to same-sex couples to ensure a sufficient statutory scheme that reflects adequate equal-protection and due-process considerations. This case raises important questions. The Legislature should answer them.

Kyra H. Bolden

S T A T E   O F   M I C H I G A N

SUPREME COURT

CARRIE PUEBLO,

        Plaintiff-Appellant,

v                                         No. 164046

RACHEL HAAS,

        Defendant-Appellee.

_____

ZAHRA, J. (*dissenting*).

    Today, a majority of this Court holds that "[a] person seeking custody who demonstrates by a preponderance of the evidence that the parties would have married before the child's conception or birth but for Michigan's unconstitutional marriage ban is entitled to make their case for equitable parenthood to seek custody." While I am sympathetic toward plaintiff's circumstances, extending the equitable-parent doctrine, a marriage-based doctrine that rests on shaky legal grounds, is inappropriate and ill-suited to provide plaintiff the relief she seeks. The majority's extension of the doctrine, and its creation of an accompanying "but for" test, is unsupported by the law and likely will result in far-reaching ramifications outside the child custody context. Because I would not extend the equitable-parent doctrine and because I believe that the Legislature, not the judiciary,

should be making these policy-based decisions, I dissent.[1]  I would decline to disturb the opinions of the lower courts in this case.

## I.  STANDARD OF REVIEW

Whether a party has standing is a legal question that is reviewed de novo.[2]  Whether a party has a sufficient basis to assert parental rights under the equitable-parent doctrine is also a question of law that is reviewed de novo.[3]

## II.  ANALYSIS

The Child Custody Act (CCA), MCL 722.21 *et seq*., grants limited standing to seek custody or parenting time to persons who are not legal parents.

> If a child custody dispute is between the parents, between agencies, or between third persons, the best interests of the child control.  If the child custody dispute is between the parent or parents and an agency or a third person, the court shall presume that the best interests of the child are served by awarding custody to the parent or parents, unless the contrary is shown by clear and convincing evidence.[4]

"Parent" under the CCA "means the natural or adoptive parent of a child."[5]  A "third person" is "an individual other than a parent."[6]  A "natural parent" includes a parent related

---

[1] I note that this Court has denied leave to appeal on this issue twice before: in *Mabry v Mabry*, 499 Mich 997 (2016), and *Kolailat v McKennett*, 499 Mich 996 (2016).  The only factor that has changed since is the composition of the Court.

[2] *Manuel v Gill*, 481 Mich 637, 642-643; 753 NW2d 48 (2008).

[3] *Lake v Putnam*, 316 Mich App 247, 250; 894 NW2d 62 (2016).

[4] MCL 722.25(1).

[5] MCL 722.22(i).

[6] MCL 722.22(k).

to the child "by birth," as opposed to "by adoption" or "through marriage," regardless of genetic connection.[7]  Under these definitions, plaintiff is not a "parent," and she is therefore not provided any parental rights by statute.[8]  Plaintiff nonetheless argues that she has standing to bring a suit for custody under Michigan's equitable-parent doctrine.

Under the equitable-parent doctrine, set forth by the Court of Appeals in *Atkinson v Atkinson*[9] and repeated by this Court in *Van v Zahorik*,[10]

> "a husband who is not the biological father of a child born or conceived during the marriage may be considered the natural father of that child where (1) the husband and the child mutually acknowledge a relationship as father and child, or the mother of the child has cooperated in the development of such a relationship over a period of time prior to the filing of the complaint for divorce, (2) the husband desires to have the rights afforded to a parent, and (3) the husband is willing to take on the responsibility of paying child support."

"Once it is determined that a party is an equitable parent, that party becomes endowed with both the rights and responsibilities of a parent."[11]

---

[7] *LeFever v Matthews*, 336 Mich App 651, 661, 665-667; 971 NW2d 672 (2021).

[8] Contrary to plaintiff's argument, *LeFever* is inapplicable in this case.  There, the Court of Appeals reversed the trial court's ruling that the birth mother was not a "natural parent" under the CCA because she lacked a genetic connection to the children.  In so holding, the Court of Appeals relied on dictionary definitions to reason that the term " 'natural parent' is elastic enough to include defendant, who, although she has no genetic connection to the twins, is related to them by the process of birthing them rather than through marriage." *LeFever*, 336 Mich App at 666.  Given that plaintiff here is not the birth mother and also lacks a genetic connection to the child, *LeFever* does not provide her with standing under the CCA.

[9] *Atkinson v Atkinson*, 160 Mich App 601, 608-609; 408 NW2d 516 (1987).

[10] *Van v Zahorik*, 460 Mich 320, 330; 597 NW2d 15 (1999).

[11] *York v Morofsky*, 225 Mich App 333, 337; 571 NW2d 524 (1997).

Plaintiff quite clearly does not satisfy one of the requirements of this doctrine: the child at issue was not born or conceived during a marriage. It is undisputed that the parties were never married. Consequently, the equitable-parent doctrine, by its own terms, is inapplicable.

A majority of this Court now creates a potential exception to this marriage requirement for those similarly situated to plaintiff. Specifically, the majority reasons that *Obergefell v Hodges*[12] "made clear that the denial of the ability to marry was a denial of same sex couples' constitutional rights" and concludes that "[r]ecognition of equitable parenthood is one of the 'constellation of benefits' associated with marriage in Michigan." The majority opinion thus holds that, "[a]s a matter of equity and constitutional law, we are compelled to treat same-sex couples equally" and that, as the concurring opinion stated in *Lake v Putnam*, " '*Obergefell* demands extension of the equitable-parent doctrine.' "[13] I disagree with the majority's decision to extend the equitable-parent doctrine under these circumstances, and I strongly disagree with the majority's conclusion that *Obergefell compels* this result. Perhaps plaintiff is entitled to a remedy via some vehicle, but the equitable-parent doctrine is quite simply the wrong one.

The equitable-parent doctrine is a judicially crafted doctrine based entirely on the sanctity of marriage. This Court's *Van* opinion addressing the doctrine repeatedly emphasized that it is premised on a marriage relationship, stating that the policy justifications backing the doctrine "can provide no justification for, and in fact are

---

[12] *Obergefell v Hodges*, 576 US 644; 135 S Ct 2584; 192 L Ed 2d 609 (2015).

[13] Quoting *Lake*, 316 Mich App at 260 (SHAPIRO, J., concurring).

4

antithetical to, the extension of the doctrine outside the context of marriage."[14]  The

majority today relies on *Obergefell* to extend the doctrine beyond the confines of marriage.

But it is curious to rely on *Obergefell* to circumvent *Van*'s marriage requirement when

*Obergefell* itself was based on the sanctity of marriage.  Moreover, in *Obergefell*, the

Supreme Court of the United States did not compel states to recognize all same-sex

relationships predating that decision.  "*Obergefell* did not grant same-sex couples anything

more than the right to have states recognize their marriage (not an insignificant right, no

doubt) and to treat *those marriages* the same as ones between heterosexuals."[15]  "[I]t did

not directly address the rights of same-sex couples who entered into some other

arrangement or agreement, regardless of whether it took the form of an informal

understanding or something more formal, such as a civil union or domestic partnership."[16]

I therefore do not read *Obergefell* as *compelling* an extension of our unique state doctrine

---

[14] *Van*, 460 Mich at 333.

[15] *Sheardown v Guastella*, 324 Mich App 251, 262; 920 NW2d 172 (2018).  In *Sheardown*, the Court of Appeals distinguished the case from others decided post-*Obergefell* where "the parties had been married (either in their state or another) and were seeking to obtain a benefit of marriage that was granted to heterosexual married couples."  *Id*. at 263.  The panel said that "when a party who comes before the court is not a part of a marital relationship, . . . he or she is not entitled to the 'constellation of benefits' referred to in *Obergefell*."  *Id*.  See also *Hawkins v Grese*, 68 Va App 462, 476-477; 809 SE2d 441 (2018) ("In sum, the entire basis of the holding of *Obergefell* is the significance and importance of *marriage* as an institution that should not be withheld from same-sex couples.  Barring procreation or adoption, pre-*Obergefell*, different-sex marriages did not automatically result in the spouses becoming legal parents of each other's children and the analysis of the *Obergefell* majority opinion does not compel a different conclusion with respect to same-sex marriages, far less unmarried couples of any sexual orientation.") (formatting altered).

[16] *Philip Morris USA, Inc v Rintoul*, 342 So 3d 656, 666 (Fla App, 2022) (citations omitted).

pertaining to parenthood. Instead, the majority actually *extends Obergefell* to, in turn, extend the equitable-parent doctrine, and it does so without adequately explaining why this extension is constitutionally required.[17]

More fundamentally, I question the soundness of the equitable-parent doctrine itself. As the Family Law Section of the State Bar of Michigan highlighted in its amicus brief, the equitable-parent doctrine is a judicially constructed concept that has not been adopted by the Legislature since its inception in 1987. Instead of codifying the doctrine, the Legislature has maintained a comprehensive statutory scheme that includes targeted third-party custody provisions. In addition to addressing child custody disputes between parents and between a parent and state agency, the CCA specifically addresses the rights of certain other third parties, e.g., legal guardians and grandparents.[18] Yet the CCA does not recognize equitable parenthood. I question whether the equitable-parent doctrine, which is premised on equitable considerations, should at all supplant or conflict with the CCA's statutory scheme, which is seemingly intended to occupy the field of child custody

---

[17] See *People v Mathews*, 505 Mich 1114, 1125 (2020) (VIVIANO, J., dissenting) ("Of course, Supreme Court caselaw is binding and must be faithfully applied. *Abela v Gen Motors Corp*, 469 Mich 603, 606[; 677 NW2d 325] (2004). But if a fair reading of the precedent does not resolve the issue we face, we have the power and the responsibility to decide the issue for ourselves. We are under no obligation to extend the scope of a precedent to cover the matter at hand . . . .").

[18] See, e.g., MCL 722.26b (standing provisions addressing guardians and limited guardians); MCL 722.26c (limited third-person custody standing and jurisdiction provisions); MCL 722.27b (grandparenting-time standing provisions).

regulation.[19]  On this point, I share the following concerns raised by the Court of Appeals in *Lipnevicius v Lipnevicius*:[20]

> [We] note that the continuing existence of the equitable parent doctrine necessitated a lengthy, multifaceted analysis of an otherwise simple and straightforward case.  In our view, the equitable parent doctrine irreconcilably conflicts with statutes intended to occupy the entire field of child custody regulation.  The governing laws, enacted by our Legislature, compel a far more direct end to this litigation.
>
> The circuit court's ruling that [the child at issue] was born out of wedlock disestablished defendant's paternity of the child, rendering defendant a "third person" under the [CCA], MCL 722.22(j).  Pursuant to MCL 722.26c(1), defendant lacked standing to bring an action for custody.  These directly applicable statutes chart the way to a simple affirmance of the circuit court's denial of defendant's motion for summary disposition.  Instead, the equitable parent doctrine resuscitates a claim otherwise unrecognized in the statutory framework governing child custody matters.  Because this doctrine clashes with the well-established principle that "the public policy issues related to child custody disputes are to be resolved by the Legislature, not the judiciary," *Van*, 460 Mich at 327, it has no place in Michigan's jurisprudence.
>
> * * *
>
> Moreover, neither the Child Custody Act nor the Paternity Act contemplates the notion of an "equitable" parent.  The Legislature simply has not bestowed parental prerogatives on persons whose status falls outside MCL 722.22(h).  Absent the equitable parent doctrine introduced in *Atkinson*, defendant would have no legally cognizable interest in custody of [the child at issue].  "Very few jurisdictions have embraced the equitable-parent doctrine adopted in *Atkinson* . . . ." *Titchenal v Dexter*, 166 Vt 373, 384-385; 693 A2d 682 (1997).  The Connecticut Supreme Court explained as

---

[19] See *Van*, 460 Mich at 330; *LeFever*, 336 Mich App at 662 ("The CCA governs custody, parenting time, and child support issues for minor children in Michigan, and it is the exclusive means of pursuing child custody rights.").

[20] *Lipnevicius v Lipnevicius*, unpublished per curiam opinion of the Court of Appeals, issued August 26, 2010 (Docket No. 289073), pp 3-5.

7

follows one rationale for other jurisdictions' rejection of the equitable parent doctrine:

> [E]ven if we were to conclude that our statutes left room for a redefinition of parentage, we are not persuaded that it would be wise to employ the equitable parent doctrine in that fashion. It is true that the doctrine has considerable emotional appeal, because it permits a court, in a particularly compelling case, to conclude that, despite the lack of biological or adoptive ties to the child, the deserving adult nonetheless may be determined to be the child's parent. This appeal may be enhanced in a given case because the best interests of the child, if determined irrespective of the otherwise invalid claim of parentage, may point in that direction. That doctrine, however, would lack the procedural and substantive safeguards provided to the natural parents and the child by the adoption statutes. In addition, the equitable parent doctrine, which necessarily requires an ad hoc, case-by-case determination of parentage after the facts of the case have been determined, would eliminate the significant degree of certainty regarding who is and who is not a child's parent that our jurisprudence supplies. [*Doe v Doe*, 244 Conn 403, 444 n 46; 710 A2d 1297 (1998), overruled in part on other grounds, *In re Joshua S*, 260 Conn 182, 796 A2d 1141 (2002).]

While the [Michigan] Supreme Court has apparently reserved this question for another day, the continuing viability of the equitable parent doctrine merits prompt and careful evaluation. In [*Hunter v Hunter*, 484 Mich 247, 251, 261, 271-275; 771 NW2d 694 (2009)], our Supreme Court overruled *Mason v Simmons*, 267 Mich App 188; 704 NW2d 104 (2005), a case similarly premised in part on equitable considerations, instead of a governing statute. This Court had held in *Mason* "that unfit parents have the burden 'to show, by a preponderance of the evidence, that a change in the established custodial environment with the guardian was in the child's best interests.' " *Hunter*, 484 Mich at 272, quoting *Mason*, 267 Mich App at 207. The Supreme Court criticized that "*Mason* and its predecessors created this new standard out of thin air." *Id*. The equitable parent doctrine suffers from the same intrinsic infirmities as *Mason*'s groundless injection of unfitness considerations into the parental presumption contained in MCL 722.25(1). As did the fit parent requirement adopted in *Mason*, the equitable parent doctrine plainly contravenes the statutory scheme governing child custody. For this reason, it should be overruled.

The *Lipnevicius* panel's general concerns about the equitable-parent doctrine are well-taken. Indeed, the majority in *Van* seemed to have similar concerns. While *Van* did apply the doctrine, the majority "[q]uestion[ed] whether it was proper for the judiciary, as opposed to the Legislature, to adopt this doctrine," but left the issue for another day because that case did not involve a married couple and therefore did not "squarely raise the issue whether equitable parenthood was appropriately adopted as a common-law doctrine . . . ."[21] I echo the sentiment expressed by this Court in that case: "In the context of a subject matter fraught with public policy implications and the Legislature's occupation of the field of child custody with the promulgation of the Child Custody Act, the judiciary is not the proper entity to create new rights or extend theories to reach new situations. The creation and extension of rights relating to child custody matters is clearly the province of the Legislature, not the judiciary."[22] In short, I am not convinced that the equitable-parent doctrine is legally sound, and I would decline to extend it today.

Putting aside this threshold disagreement, I also question the majority's new "but for" test that is to be applied as a precursor to application of the equitable-parent doctrine. The majority holds that "a would-be equitable parent has standing if they demonstrate by the preponderance of the evidence that the parties would have married before the child's birth or conception but did not because unconstitutional laws prevented them from doing so." I tend to agree with the Court of Appeals in *Lake* that

> we simply do not believe it is within courts' discretion to, at the request of
> one party and in light of the United States Supreme Court's decision in

---

[21] *Van*, 460 Mich at 335 n 6.

[22] *Id*. at 330.

9

> *Obergefell*, retroactively transform an unmarried couple's past relationship into marriage for the purpose of custody proceedings. Stated differently, it is, in our view, improper for a court to impose, several years later, a marriage on a same-sex unmarried couple simply because one party desires that we do so.[23]

I am uncomfortable with retroactively recognizing a marriage-equivalent relationship. And I do not follow the majority's assertion that these concerns are "remedied" by the creation of its but-for test, which undeniably will operate to go back in time to label certain relationships a "marriage" for purposes of the equitable-parent doctrine. Moreover, I question the functionality of this but-for test. The test requires courts to speculate as to whether a same-sex couple would have chosen to get married had they possessed the opportunity to do so. Courts will be required to dive into all public and private aspects of a now-defunct relationship to hypothesize whether the couple would have chosen to marry. This is an especially difficult inquiry where litigation will undoubtedly be complicated by facts no longer discoverable and where, as here, one party to the couple adamantly denies that they would have married. I am unsure that a court is even capable of finding with confidence that the *only* reason a same-sex couple did not marry, pre-*Obergefell*, was because they legally could not do so.

Apart from the practical complications of this test, I am also concerned about the broader ramifications of its creation. While the majority appears confident that its expansion of the equitable-parent doctrine and accompanying but-for test will remain limited to the child custody context and will not "create a legal morass in other areas of the law," I am not so sure. Defendant astutely reasons that a similar type of "but for" argument

---

[23] *Lake*, 316 Mich App at 253 (opinion of the Court) (citation omitted).

is likely to be advanced in nearly every area of the law to create avenues of redress for individuals, or classes of individuals, for whom prior iterations of the law did not provide relief, irrespective of whether the law was valid and constitutional and subsequently changed or whether the law was flawed and unconstitutional and successfully challenged. In the context of same-sex relationships alone, those couples who were not married pre-*Obergefell* might rely on today's decision to argue that they were denied the same access to legal rights on issues of property division, spousal support, and any of the other traditional areas of domestic-relations law that accompany a divorce. Retroactive application of *Obergefell* might also implicate other areas of the law such as consortium damages, intestate succession and spousal election, and employee benefits and coordination law. In short, adoption of today's test might not be a narrow carveout at all, but could instead inspire similar challenges in other areas that will prevent finality in the law. I highlight these concerns not because I am necessarily opposed to change in these areas of the law, but because they underscore the significance of the majority's holding and because I believe that such matters of policy are for the Legislature to decide.

Similar concerns seemed to motivate the majority in *Van*. There, the Court quoted the Illinois Supreme Court in *Hewitt v Hewitt*,[24] noting that it "thoughtfully addressed the propriety of the judiciary weighing the equities in claims between cohabitants":

> "There are major public policy questions involved in determining whether, under what circumstances, and to what extent it is desirable to accord some type of legal status to claims arising from such relationships. . . . In the event of death shall the survivor have the status of a surviving spouse for purposes of inheritance, wrongful death actions, workmen's compensation, etc.? And still more importantly: what of the children born of

---

[24] *Hewitt v Hewitt*, 77 Ill 2d 49; 394 NE2d 1204 (1979).

such relationships? What are their support and inheritance rights and by what standards are custody questions resolved? What of the sociological and psychological effects upon them of that type of environment? Does not the recognition of legally enforceable property and custody rights emanating from nonmarital cohabitation in practical effect equate with the legalization of common law marriage . . . ?"[25]

Based in part on these concerns, this Court in *Van* said that "because the requested extension of the equitable parent doctrine would affect the state's public policy in favor of marriage, the Legislature is clearly the appropriate entity to consider this issue."[26] I agree with this general sentiment that the judiciary should not be making these policy-based decisions. Instead, "[t]he creation and extension of rights relating to child custody matters is clearly the province of the Legislature, not the judiciary."[27]

For these reasons, I would decline to extend the equitable-parent doctrine as a potential avenue of relief in this case. Perhaps there were better arguments to be made, but plaintiff has not meaningfully grappled with any constitutional analysis. To the contrary, I found plaintiff's brief to be unhelpful in resolving the important legal issues before us. I decline to dissect constitutional issues for her. I again emphasize that the Legislature constitutes the most appropriate forum for resolving the policy issues presented in this case. As defendant herself states, the Legislature might want to reconsider the definition of "parent" under the CCA and reexamine the bases upon which a third party or third person, unrelated by marriage, might initiate a custody complaint under MCL 722.26c. But because I do not believe that extending the equitable-parent doctrine is the proper vehicle

---

[25] *Van*, 460 Mich at 332-333, quoting *Hewitt*, 77 Ill 2d at 58.

[26] *Van*, 460 Mich at 333.

[27] *Id*. at 330.

12

through which to provide plaintiff the relief she seeks, and because this is the remedy that plaintiff sought in this Court, I would decline to intervene in this case.

### III.  CONCLUSION

I disagree with this Court's extension of the equitable-parent doctrine.  I question the validity of the doctrine and do not believe it is an appropriate tool to provide plaintiff the relief she seeks.  Furthermore, I question the advisability of the "but for" test set forth by the majority and worry that it will be applied too broadly.  Plaintiff's remedy rests with the Legislature rather than the judiciary.  For these reasons, I would decline to disturb the lower courts' decisions.  I respectfully dissent.

Brian K. Zahra
David F. Viviano

13